Next case we have for argument is Hyde v. City of Wilcox. Mr. Jellison you may begin when you're ready and let us know if you want any time for rebuttal. Good morning your honors. May it please the court my name is Jim Jellison and in this case I represent a number of people from the Cochise County Sheriff's Office Robinson, Palgo, Bolander, Giganto, Noland and Sheriff Daniels from the City of Wilcox, Faulkner, Callahan, English, Valley and the director of the department Mr. Hadfield. I do want to reserve at least three minutes and my my recitation of the names is quite intentional. If we were dealing with a denial of qualified immunity excuse me from one person or for two persons who were defendants in case in cases we would look at the conduct as it's alleged in the complaint for each of those two people and decide does that conduct rise to the level of unconstitutional behavior and even if it does does it violate clearly established law that existed at that time that would have informed that person that what they're doing under those circumstances is unconstitutional and the fact excuse me the fact that we have ten individuals doesn't vitiate that requirement in to any degree and that was really the fundamental error at the district court level. We had ten ten people involved here whose conduct is described in this complaint and and not once did the plaintiff or the district court make an effort to identify whether their individual conduct violated the Constitution or clearly established law and they're entitled to that. If I may ask a question here, it appears at least based on the brief and the complaint that there was some jailhouse video but it doesn't appear that there's a video in the record. Can you explain why that video isn't in the record? I think that when we briefed this case originally the feeling was and truthfully the plaintiff had captured most of this event fairly accurately in the complaint and so I don't recall that actually being offered but it's certainly not part of the necessary. You know this this complaint really does describe an event in in very clear terms and and in two very distinct ways. You've got the first five and a half hours of Mr. Hyde's incarceration where he is administered a blood draw where he is in a cell again for five and a half hours and where he's engaged in in relatively innocuous behavior described by the plaintiffs as napping, eating, talking to detention staff, requesting a phone to talk to a lawyer. There's not a single allegation that Mr. Hyde raised any mental health issue that needed to be addressed immediately or any any physical issue that needed to be addressed immediately. The only medication that's described in the complaint as being identified relative to Mr. Hyde on his arrest was Adderall and there is certainly no constitutional principle that's going to require a jail annex to administer Adderall to a detainee at 2 in the morning before they're seen by medical staff. We can fast forward a certain point according to the complaint he is they put leg shackles on him and he's handcuffed and after that according to the complaint one of the officer tases him again uses a taser on him again another officer puts him in some kind of head restraint and you know at that point if he's already shackled you know feet as well as hands you know why was the use of force necessary and here you know why I asked him you know about the jailhouse video is that that actually would have been helpful for us to be able to see what is that exactly happening but based on the complaint when someone brought the hands and feet are shackled why was done use unreasonable use of force to tase him again and put him in a head restraint. According to the allegations of the complaint your honor Mr. Hyde was involved in a in a chaotic fight with county and city staff for 15 minutes in this case I mean he is he is the instigator of that according to this hands and feet are what can you do if you're shackled both your hand and feet at that point I understand it was chaotic and perhaps the use of force prior to that was reasonable but once both the hand and feet are shackled and there are several officers surrounding him I'm not sure what he can do again that's why I asked for the video because maybe that would have shed more light on what was happening but just based on the allegations of the complaint I'm not sure why any force would have been necessary at that point and your honor I'm not sure that I agree with the characterization that that's what the allegations say at 751 Mr. Hyde's taken out of his cell in order to be evaluated for the self-inflicted head injury and then immediately he's described by the plaintiff's complaint as sprinting in a fight-or-flight panic toward the female common area of this jail annex and this is not you know the Department of Corrections here it's not even a Maine County Jail it's a jail annex so you can you can literally run from the male common area to the female common area he's pursued he meets a dead end and he turns to face the three officers that are there at the time and it's at that point that he's tased there's no handcuffing there's no shackling at that point they're trying to control him they get to the doorway again using the terms of the complaint there's still a scuffle there still is a fray that lieutenant lieutenant Giganto and sergeant Nolan join in on involving Hyde they're still trying to control him in fact at that moment in time he's described by the plaintiffs as fending himself against the officers why a detainee in a jail is fending themselves off against the officers at all is a problem for jail security that needs to be addressed through the use of physical force he's not fully restrained until he's put in a restraint chair at 806 the last taser use was on his thigh at 805 there was no use of force used on mr. Hyde after he was restrained at 806 at 815 the restraints were tightened by sergeant Prago and it's not until 824 that he these more critical symptoms he rolls his head back according to the complaint three minutes later he takes his last breath at 829 that's the first time that staff notices that there's a medical problem and they act immediately there's no allegation that mr. Hyde was left alone but there's also no allegation that any of the individual officers perceived that there was a medical emergency and were deliberately indifferent to that emergency in other words if they ignored it now look at the complaint I think you know I agree with you perhaps on the use of force while there's a scuffle and resistance but now I'm looking at the complaint paragraph 26 talks about how quote at leg irons were fastened onto him and they use a taser on him perhaps he was resisting so you need to use the taser to fasten the leg irons then paragraph 27 it says at 802 a.m. they quote unquote ultimately handcuffed Luke Hyde's hands behind his back so at this point and then paragraph 28 says at 805 a.m. defendant Prago activated his taser on Luke Hyde's side one more time while defendant Calhoun English forced Luke Hyde's head into restraint hold that's the the troubling part here at least for me is paragraph 28 the allegations here is that his hands are handcuffed behind his back there are leg restraints on his foot why was it necessary to use the taser again and put him in the restraint hold and again I'm you know I sound like a broken record but that's why I wish we had the video so we could see what is happening and perhaps there is an explanation for this but you know since there's no video we have to you know at this you know pleading stage we have to accept what's alleged in the complaint and I believe your honor at paragraph 29 so even following 28 he's described as continuing defend himself against the officers so and and actually I could be wrong about that but that's the paragraph 49 does that he's bending himself again but but I mean you know part again we have to construe things in non-moving party and you know I'm not sure if you're restrained foot in hand what bending you know what that really poses any real danger to several officers rounding him even if he's whatever fending off means in this context mr. jealous and if I can just ask into apart from the matter of the excessive force claim in terms of inadequate medical care does the record reflect that the officers waited until after the decedent was found without a pulse to check on him after the altercation the record well the complaint does not talk in terms of I think pre restraint evaluation I think the record talks in terms of putting him into the restraint chair in order to control him at 806 tightening the straps on the restraint chair at 815 without any reference to there being any medical distress that would be noticed at that time and that he rolls his head back at 827 or excuse me 824 and takes his last breath at 827 according to the complaint the first issue of medical distress that is noted by any of the staff that are present on the scene is at 829 when they find impulses get him out of the chair and make efforts to resuscitate him and I hope that answers the question but I I think that's how the complaint reads and and we need to take the complaint as it is that and I think that's why we have the plausible claim standard is that if there was you know we I think they cite the Jones case versus Las Vegas Metropolitan Police and there's an that's an extreme case where somebody subdued they're on the ground and they're in handcuffs and then they're tasered for 90 seconds by multiple officers after that point this is not that case these allegations show mr. Hyde fighting all the way through paragraph 29 and and no force applied after he's completely restrained in the restraint chair and unable to sort of quote-unquote fend himself off against the officers and the major point when it comes to qualified immunity is there's no clearly established law that would guide these these officers and this detention staff that they couldn't use tasers or they couldn't use the peroneal strikes while somebody is fighting them and while while that person is still fending them off all the way through the point of time where they're placed in a restraint chair not not a single case that would inform the officers of that fact I think we all know that that officers in a detention setting have to maintain security and control they can't just let somebody run run amok or attempt an escape they have to use force and quite frankly this one person fighting off a group of eight seven or eight people the amount of force that was actually applied in this case what was relatively minor when it comes to tasing and below the way strikes there were no head strikes batons certainly no handguns pepper sprays I mean they're trying to control a man who's creating a chaotic scene in the jail setting plaintiff has not shown a single case that would inform any of these officers that their conduct violated clearly established law and that's why they were entitled to qualified immunity if I may reserve my minute 19 seconds thank you so you're on me okay good morning your honors I'm gonna cover the topics that we've just that mr. Jellison just now covered in terms of why the video wasn't attached to the complaint or the briefing as mr. Jellison noted we felt that the complaint itself was was very detailed in terms of providing a very accurate account minute by minute of what occurred that day and so that we can comfortably rely on the constitutional right to be free from the continued use of force after he was subdued and restrained so defendants are trying to reframe the issue by arguing that it doesn't offend the Constitution for an actively fleeing actively resisting detainee to be subjected to tackles tasing strikes and a restraining chair and at the end there mr. Jellison was was sort of implying that this force was relatively inert well if it was so inert then why is it that it caused Luke's death but again so this is not a situation where Luke was actively resisting the entire time and I think you got it you hit the nail on the head judgely is that we what we tried to explain here is that we've got five stages of restraint that were applied to Luke and excessive force was used certainly at the latter stages unnecessarily even after Luke was subdued so you have the initial tasing that took place and and Robinson Prago and Bollender were involved in that Robinson tases Luke twice Prago tases him once that then is followed by a gang tackle we've got five officers that heap on to Luke and that's Robinson Prago Bollender Nolan in Giganto during that time Robin deliver Robinson delivers 11 closed-fisted perineal strikes to Luke's legs Prago at that same time tases Luke yet again not just once but twice and during that process leg irons are fastened on to Luke and the complaint says that at that point these six five officers attempt to drag Luke on to his but Luke is so fatigued that he collapses to his knees and and at that point then the officers there's six of them at this time Robinson Bollender Nolan Giganto Val and Callahan English who are wrenching and torquing his body trying to get handcuffs on to his limp body and then by the time the restraint chair is finally retrieved it takes four offers that officers we note in the into the restraint chair and at that time Prago tases Luke again unnecessarily once on his thigh and then Callahan English unnecessarily puts Luke's head into a restraint hold while then after that the restraint chairs straps are tightened on to him so what we have here is an escalating use of force that was used on Luke even after he was restrained and subdued and that use of force reached a fatal level that caused Luke's death and so this case is like Jones v Las Vegas Metropolitan Police Department because that case demonstrated that a suspect has a clearly established constitutional right to be free from the continued use of force after he's subdued and restrained and specifically the court said that the use of force can't be used on a prone suspect who exhibits no resistance carries no weapon is surrounded by sufficient officers to restrain him and is not suspected of a violent crime so Jones in that case like loose Luke he attempted to flee he didn't threaten the officer he didn't commit a serious offense like Luke didn't he wasn't armed armed and the court there said that the initial use of critical here the sit when the situation evolved the justification for the continued use of force waned and and and at that time the officers continued to tase Jones even as he was being handcuffed just as the officers here continue to tase Jones even after he was already in late leg irons and handcuffed and so the court in Jones said that the use of force was not necessary after Jones was prone and surrounded by four officers and Jones as we know died as a result of the restraining procedures our case is even more favorable so to speak than Jones because Luke wasn't just hazed like Jones Luke was dealt 11 close-fisted perineal strikes he was tased I believe five perhaps six times and he was put in a restraint hold after he was subdued and restrained and whereas Jones encountered just one to four officers at any one time Luke encountered between three and seven officers and unlike Jones and probably most importantly here Luke was a mentally disabled detainee who had been deprived of his prescription medication so yes the qualified immunity issues I the record shows that mr. Hyde had you know after being restrained with the handcuffs and and foot shackles completely submissive and did nothing I think that that would be a very easy case here except with that again we don't have the video the complaints a little bit ambiguous you know the complaint does say he wasn't fully secured until 806 a.m. and that he was fending himself off I mean is there what's I don't know if Jones is directly on point and it may depend on you know what exactly mr. Hyde was doing at that time I mean is there can you shed any more light on what was happening at that point I mean I guess we're limited to complaint here and maybe we can do it in your favor but that to me is a sticking point here that even now I'm not sure what was happening after 805 until he was fully secured well in terms of the the the choice of words I think that that's semantics to say he was fending fending against five to six officers the point there is that he was that there were five to six officers using force of some degree against him at any one time so perhaps the use of the word fending was was not really the the word that that we maybe we could have picked a better word but that doesn't mean to imply that he was actively aggressing or resisting at that time but I think that the the complaint makes it very clear that after the time that he has been shackled that his lights have been shackled and they attempt to to drag him to his feet but he's so fatigued that he collapses to his knees at that point he's clearly subdued he's restrained by the shackles he's surrounded by five to six officers at that time and and he's he's so limp that they're they're having difficulty trying to even put the handcuffs on him at that point he's subdued and any additional force used against him subsequently is is excessive force and a constitutional violation. Your your Monell claim was not just based upon inadequate training it was also based on pattern and practice was it not? Inadequate training. Exclusively inadequate training? I believe so yes and and moving to the inadequate medical care and there's two components there one which relates to Luke's clearly established constitutional right to receive medical attention or monitoring after his extreme physical altercation with the officers all of the officers that were involved in the altercation meaningfully participated in the inaction that gave rise to this constitutional violation the defendants improperly improperly I think attempt to argue the factual issue of the debris of the officers knowledge but in the complaint we sufficiently allege knowledge we allege that Luke and the officers engaged in extreme physical altercation but despite that knowledge Luke was left unattended for 22 minutes and by the time he was finally checked on he had stopped breathing and he had no pulse and so this case is very similar to the case of Sandoval v. County of San Diego where the court found that a nurse was not entitled to qualified immunity or the nurse was told that Sandoval was sweating tired and disoriented but the nurse didn't treat Sandoval and rather that nurse left Sandoval unattended now similar to the officers here that nurse sat 20 feet away but the court still deemed that nurse to have abandoned Sandoval and Sandoval later died of a meth overdose and so in that case this court also cites to Jet v. Penner where this court held that prison officials violate the Constitution when they quote deny delay or intentionally interfere with needed medical treatment and here Luke needed medical treatment and at a very minimum that treatment or monitoring in this instance at the very least was delayed but Sandoval was a 2021 decision right when this incident occurred well Sandoval found that clearly established right by by citing to two cases and perhaps more but my notes reflect Jet v. Penner which is a 2006 case as well as Clement v. Gomez which is an earlier case I don't have right in front of me but certainly predate the incidents here and I've already talked about Jet v. Penner but Clement v. Gomez is a similar situation where the court found that there was a constitutional violation for the failure to provide adequate medical care where officers knew that inmates had been exposed to pepper spray but waited for hours before allowing them to their cells to shower so similarly here the officers knew that Luke had been engaged in this very extreme physical altercation and that he was subdued with handcuffs leg irons and in a restraining chair but nonetheless they left him unattended for 22 minutes. Pardon me Ms. Sells could I ask you a question what symptoms did Mr. Hyde present that required specific medical attention once he was restrained in that chair just gasping is that that's the only thing I see that he was doing is gasping what what kind of medical treatment do you monitoring at the very least I'm not a medical professional so I'm not really sure I what sort of follow-up treatment would be given but to to monitor him. I think if you if you're going to claim under Estelle v. Gamble that he should get he's gotten inadequate medical treatment you have to allege a fact which gives rise to a risk realized by one of the defendants and the only thing I can see is that the man was restrained and gasping what what type of risk of injury does gasping after a fight take? Right I I would again having no medical background my assumption would be that the inability to breathe is a very serious medical condition and it could have been a myriad of things it could have been that his lungs were punctured it could have been that the the restraint hold on his neck somehow interfered or blocked his breathing it could have been that the restraint hold was too tight and was preventing him from breathing but we do know that that I somehow I the the culmination of the various injuries that he sustained through this altercation led him to stop breathing and and led his heart to stop beating. What type of I'm you know I have a difficulty that going from observation of gasping by a restrained individual after he's had a very exercised period of fighting to seeing what risk of injury was conveyed by the gasping and what you're saying is you don't know because you're not a medical doctor neither am I but some sort of medical supervision should have been provided what sort of medical supervision a nurse a doctor I'm having difficulty. It could have been someone who was medically trained I believe that at least one of the officers there was someone who was medically trained if it might have been Faulkner if I'm not mistaken but I think that any one of the officers would have been adequately capable of observing someone who is desperately gasping for air and in the result of this the the worst possible injury of an inability to breathe would be what happened here which is death. All right. Thank you. And I say I'm out of time. Thank you so much. Mr. Jellison. I think you're still on mute. I told myself I wouldn't do that. I'll speak fast on this. I agree I agree judge Lee that Sandoval can't apply as clearly established law because it's a 2021 case but also because that's an instance where the staff was informed that that the inmate had a symptoms of methamphetamine overdose and was unobserved for six to eight hours. We're dealing with a period of time where Prago tightens the straps at 815 and doesn't notice anything. The head rolls back at 824 and he's discovered in there is no clearly established law that requires observation or prescience under those circumstances and so there is no constitutional inadequate medical care. On excessive force I still go back to 29 where it says at all times Luke was fending himself off. He was tasered at a time where he had leg irons on but no handcuffs on. The only time that he was he was use of force occurred after leg irons handcuffs was as they were putting him into the restraint chair. That's the only time and my concern is we're still lumping everyone together and we're not looking at the individually alleged conduct. I think when we do we see no constitutional violation and no clearly established law violated. Thank you. Thank you. The case has been submitted.
judges: BEA, LEE, Bennett